THE LAW OFFICES OF JUSTIN SOBODASH
Justin Sobodash (State Bar # 217450)
justin_sobodash@yahoo.com
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone:  310.461.3577
Facsimile:   310.461.1901

INSTITUTE FOR JUSTICE
Jeff Rowes*
jrowes@ij.org
Robert McNamara*
rmcnamara@ij.org
William H. Mellor*
wmellor@ij.org
901 North Glebe Road, Suite 900
Arlington, VA  22203
Telephone:  703.682.9320
Facsimile:   703.682.9321
*Admitted pro hac vice

Attorneys for Plaintiffs
DOREEN FLYNN, ET AL.

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


DOREEN FLYNN, ET AL.        )
                 Plaintiffs,        )        CASE NUMBER:
            v.                      )        CV09- 7772 VBF (AJWx)
ERIC HOLDER, ATTORNEY  )
GENERAL                      )        _____
                 Defendant.        )        PLAINTIFFS' MEMORANDUM OF
                            )        POINTS AND AUTHORITIES IN
                            )        OPPOSITION TO DEFENDANT'S
                            )        MOTION TO DISMISS
                            )
                            )        Hearing Date:  March 15, 2010
                            )        Hearing Time:  1:30 p.m.
                            )        Hearing Location:  Courtroom 9
                            )
                            )        Before the Honorable Valerie
_____  )        Baker Fairbank

1

## **<u>TABLE OF CONTENTS</u>**

2

<u>Page</u>

3  TABLE OF AUTHORITIES ........................................................................ ii

4  INTRODUCTION ....................................................................................... 1

5  FACTS ......................................................................................................... 1

6  ARGUMENT ............................................................................................... 3

7     I.     PLAINTIFFS HAVE STANDING .................................................. 3

8            A.  Plaintiff Dr. John Wagner Has Standing ................................ 3

9                   1.  Dr. Wagner has standing as a physician ........................ 4

10                  2.  Defendant misunderstands Plaintiffs' injuries .................. 6

11           B.  Plaintiff MoreMarrowDonors.org Has Standing ...................... 8

12                  1.  MoreMarrowDonors.org has a concrete plan to violate
                         NOTA and a reasonable fear of prosecution for violating
13                       NOTA .............................................................................. 8

14                  2.  MoreMarrowDonors.org suffers an economic injury ....... 10

15           C.  The Other Individual Plaintiffs Have Standing ...................... 12

16    II.    APPLYING NOTA TO PLAINTIFFS VIOLATES THE EQUAL
             PROTECTION GUARANTEE OF THE FIFTH
17           AMENDMENT ............................................................................ 12

18
             A.  This Court Should Apply The Rational-Basis Test As It Is
19               Actually Applied by the Supreme Court ................................ 13

20           B.  Federal Courts Reject Four Classes of "Rational" Bases ........ 14

21           C.  Defendant Holder Asserts No True Rational Basis ................ 18

22    III.   APPLYING NOTA TO PLAINTIFFS VIOLATES DUE
             PROCESS .................................................................................... 23
23
             A.  Rational-Basis Review ............................................................ 24
24
             B.  Fundamental Rights ................................................................ 24
25

26  CONCLUSION ............................................................................................ 25

27

28

i

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

<u>CASES</u>

4
5
*Abigail Alliance for Better Access to Dev. Drugs v. McClellan*, No. 03-1601, 2004 U.S. Dist. LEXIS 29594 (D.D.C. August 30, 2004) ...........................7, 8

6
7
*Abigail Alliance for Better Access to Dev. Drugs v. von Eschenbach*, 495 F.3d 695 (D.C. Cir. 2007) ....................................................................................8

8
*al-Kidd v. Ashcroft*, 580 F.3d 949 (9th Cir. 2009) ............................................3

9
*Allegheny Pittsburgh Coal Co. v. County Comm'n*, 488 U.S. 336 (1989)......17

10
*Babbitt v. United Farm Workers Nat'l. Union*, 442 U.S. 289 (1979).............10

11
*California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088 (9th Cir. 2003) ..9

12
*Chappelle v. Greater Baton Rouge Airport Dist.*, 431 U.S. 159 (1977).........17

13
14
*Citizens United v. FEC*, No. 08-205, 2010 U.S. LEXIS 766 (Jan. 21, 2010) ..................................................................................14

15
*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ...13, 15, 16, 17

16
*City of Lakewood v. Plain Dealer Publ'g. Co.*, 486 U.S. 750 (1988).............25

17
*City of New Orleans v. Dukes*, 427 U.S. 297 (1976).......................................20

18
*Compassion in Dying v. Washington*, 79 F.3d 790 (9th Cir. 1996) .............4, 5

19
*Cornwell v. Hamilton*, 80 F. Supp. 2d 1101 (S.D. Cal. 1999) .................17, 18

20
*Craig v. Boren*, 429 U.S. 190 (1976)...........................................................6, 7

21
*Dillingham v. INS*, 267 F.3d 996 (9th Cir. 2002) ...........................................17

22
*Doe v. Bolton*, 410 U.S. 179 (1973) ................................................................4

23
*FCC v. Beach Communications, Inc.*, 508 U.S. 307 (1993)...........................14

24
*Heller v. Doe*, 509 U.S. 312 (1993)....................................................13, 14, 15

25
*Hooks v. Clark County Sch. Dist.*, 228 F.3d 1036 (9th Cir. 2000)................24

26
*Hooper v. Bernalillo County Assessor*, 472 U.S. 612 (1985) ........................16

27
*In re Levenson*, 587 F.3d 925 (9th Cir. 2009) ....................................16, 17, 18

28

ii

1  *James v. Strange*, 407 U.S. 128 (1972) ............................................................18

2  *Lawrence v. Texas*, 539 U.S. 558 (2003)..........................................................16

3  *Lazy Y Ranch, Ltd. v. Behrens*, 546 F.3d 580 (9th Cir. 2008)..................14, 16

4  *L.B. Research and Educ. Found. v. UCLA Found.*, 29 Cal. Rptr. 3d 710 (Cal.

5  Ct. App. 2005) ...............................................................................................11

6  *Lindsey v. Normet*, 405 U.S. 56 (1972) ............................................................18

7  *Lujan-Armendariz v. INS*, 222 F.3d 728 (9th Cir. 2000)..................................17

8  *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .........................................6

9  *Mayer v. Chicago*, 404 U.S. 189 (1971)...........................................................17

10  *Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008).................................16, 17

11  *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869 (1985) .........................................16

12  *Milnot Co. v. Richardson*, 350 F. Supp. 221 (S.D. Ill. 1972)..........................23

13  *Nat'l Ass'n of Optometrists & Opticians v. Brown*, 567 F.3d 521 (9th Cir.

14  2009) ................................................................................................................3

15  *Nat'l Audobon Society, Inc. v. Davis*, 307 F.3d 835 (9th Cir. 2002)..........10, 11

16  *Nordlinger v. Hahn*, 505 U.S. 1 (1992) ............................................................15

17  *Petzak v. Nev. Dep't of Corr.*, 579 F. Supp. 2d 1130 (D. Nev. 2008)..............17

18  *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) .................9, 10

19  *Planned Parenthood of Idaho v. Wasden*, 376 F.3d 908 (9th Cir. 2004)......4, 5

20  *Plyler v. Doe*, 457 U.S. 202 (1982) ..................................................................18

21  *Quinn v. Millsap*, 491 U.S. 95 (1989) ..............................................................17

22  *Ramirez-Altimirano v. Holder*, 563 F.3d 800 (9th Cir. 2009)........................17

23  *Reed v. Reed*, 404 U.S. 71 (1971)......................................................................18

24  *Romer v. Evans*, 517 U.S. 620 (1996) ..............................................................16

25  *San Diego County Gun Rights Comm. v. Reno*,

26  98 F.3d 1121 (9th Cir. 1996) .......................................................................8, 9

27  *Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005) ................................9, 10

28

1   *Servin-Espinoza v. Ashcroft*, 309 F.3d 1193 (9th Cir. 2002) ..........................15

2   *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002)........................................17

3   *Simon v. Eastern Kentucky Welfare Rights Organization*,
4   426 U.S. 26 (1976)..........................................................................................6, 7

5   *Singleton v. Wulff*, 428 U.S. 106, 117 (1976)....................................................5

6   *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134 (9th Cir.
7   2000) .......................................................................................................8, 9, 10

8   *Thomas v. Mundell*, 572 F.3d 756 (9th Cir. 2009) ............................................3

9   *Turner v. Fouche*, 396 U.S. 346 (1970)...........................................................17

10   *United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938)...........................23

11   *United States v. Cheng Yong Wang*, 1999 U.S. Dist. LEXIS 2913 (S.D.N.Y.
12   March 15, 1999)................................................................................................10

13   *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973)..................14, 15, 16, 17

14   *U.S. v. Lopez*, 514 U.S. 549 (1995) ................................................................17

15   *U.S. v. Morrison*, 529 U.S. 598 (2000)...........................................................17

16   *Washington v. Glucksberg*, 521 U.S. 702 (1997) .......................................4, 24

17   *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975) ......................................14, 15

18   *Williams v. Vermont*, 472 U.S. 14 (1985)..................................................15, 17

19   *Zobel v. Williams*, 457 U.S. 55 (1982) ......................................................16, 17

20

21   STATUTES AND FEDERAL RULES

22   42 U.S.C. § 274e...........................................................................................1, 10

23   42 U.S.C. § 274k..............................................................................................22

24   42 U.S.C. § 274l...............................................................................................22

25   42 U.S.C. § 274m.............................................................................................22

26   Fed. R. Civ. P. 8(a) ..........................................................................................10

27

28

iv

1  <u>MISCELLANEOUS</u>

2  David Porter & Carla K. Johnson, *Brooklyn Man Accused of Buying and*
3  *Selling Kidneys*, Associated Press, July 25, 2009 ...........................................10

v

<u>INTRODUCTION</u>

This action presents constitutional questions of first impression that are matters of life and death. Defendant has moved to dismiss for lack of jurisdiction and failure to state a claim. But Defendant's jurisdictional argument ignores controlling precedent and misconstrues the injuries alleged in the Complaint, and his merits argument relies on a caricature of the rational-basis test under which the government can never lose. Because Plaintiffs should prevail if they prove the allegations of their complaint, Defendant's motion should be denied.

<u>FACTS</u>

Plaintiffs want to offer financial incentives through a nonprofit pilot program to recruit donors for lifesaving bone-marrow transplants, but their plan violates the National Organ Transplant Act (NOTA), 42 U.S.C. § 274e, which makes it a crime to offer "valuable consideration" for a "human organ" or "subpart thereof." NOTA defines "bone marrow" as a "human organ."

But bone-marrow transplants do not involve the transplantation of bone marrow, which is a spongy tissue inside the bones. Compl. ¶ 85. Instead, in what is misleadingly called a "bone-marrow" transplant, fluid marrow cells (which are just immature blood cells) are drawn from a donor's bloodstream or bone marrow using a needle and then given to the patient through an ordinary blood transfusion. Compl. ¶¶ 71-78; 85-100; 105-08. As with the donation of other blood cells, marrow-cell donation is safe, and donated marrow cells regenerate in three to six weeks. Compl. ¶¶ 101-04.

Bone-marrow transplants are often the only hope for people with deadly diseases such as leukemia. Compl. ¶¶ 79-84; 105-08. Tragically, not enough marrow-cell donors are ready and willing to donate. Thousands have died

- 1 -

1  because of this persistent shortage. Racial minorities face the longest odds of

2  finding a donor. Compl. ¶¶ 138-45.

3      The Plaintiffs are a world-renowned bone-marrow transplant doctor, a

4  California nonprofit corporation, and a group of patients, family members of

5  patients, and bone-marrow activists who wish to offer compensation to

6  potential marrow-cell donors. Compl. ¶¶ 13-70. Plaintiff

7  MoreMarrowDonors.org has designed a pilot program under which a fixed

8  $3,000 award would be offered to donors with the most-needed marrow-cell

9  types. Compl. ¶ 146. Plaintiffs expect this award (not cash, but a scholarship,

10  housing payment, or gift to the charity of the donor's choice) will increase the

11  number of people who volunteer to be marrow donors, as well as increase the

12  number of volunteers who are available and willing to donate when called

13  upon. Compl. ¶¶ 147-48. The program would not create any markets, nor

14  would it involve direct action on behalf of any particular patient or negotiation

15  with donors.[1] Compl. ¶¶ 151-53. MoreMarrowDonors.org has already been

16  awarded a restricted grant that may be spent only on implementing this pilot

17  program. Compl. ¶ 157.

18      Applying NOTA to Plaintiffs' pilot program makes no sense. In passing

19  NOTA, Congress sought to criminalize markets in nonrenewable solid organs

20  like kidneys, and deliberately chose not to criminalize payment for renewable

21  cells like blood cells. Compl. ¶¶ 167-90. None of the concerns behind the ban

22  on markets in solid organs apply to compensation for renewable cells like

23  blood cells or sperm cells; not only did Congress recognize this fact, but

24  people continue to receive compensation for renewable cells every day.

25

26  [1] By law, donors and patients are matched anonymously (typically through the National
      Marrow Donor Program's national registry), and that anonymity must be maintained for a
27  full year after the marrow-cell transplant, rendering any direct negotiations between donor
      and patient impossible. Compl. ¶¶ 131-38; 151.
28

1   Compl. ¶¶ 182-85. It is factually inaccurate to call marrow cells "organs," and

2   nothing in NOTA's legislative history indicates that Congress deliberately

3   departed from the biological definition of "organ" in drafting NOTA. Compl.

4   ¶¶ 169; 186-89. Indeed, the only plausible explanation for NOTA's arbitrary

5   treatment of bone marrow is that Congress just erred, not understanding that a

6   "bone-marrow transplant" is simply a kind of blood transfusion. *See supra*.

7        Plaintiffs have filed this lawsuit to obtain an order allowing them to

8   offer the financial incentives outlined above and in the Complaint—and, in so

9   doing, to save lives. Relief from this Court is proper because NOTA's ban on

10  financial incentives for marrow donors is arbitrary and thus unconstitutional.

11                              <u>ARGUMENT</u>

12       On a motion to dismiss, courts must accept "as true all facts alleged in

13  the complaint, and draw[] all reasonable inferences in favor of the plaintiff."

14  *al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009). Because Defendant's

15  brief in support of his motion (hereinafter "MTD") does not establish that the

16  Complaint fails to allege any facts that could support a judgment from this

17  Court, his Motion to Dismiss must be denied in full.

18  **I.    PLAINTIFFS HAVE STANDING**

19       To prevail on his motion to dismiss for lack of jurisdiction, Defendant

20  must establish that not a single Plaintiff has standing. If even one Plaintiff has

21  standing, the jurisdictional inquiry is over. *See Nat'l Ass'n of Optometrists &*

22  *Opticians v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009); *Thomas v. Mundell*,

23  572 F.3d 756, 760 (9th Cir. 2009). Defendant cannot carry this burden.

24       **A. Plaintiff Dr. John Wagner Has Standing.**

25       Defendant does not address Plaintiff Wagner's standing, nor even

26  acknowledge that physician standing is different from the standing of non-

27  physician litigants. Plaintiff Wagner has alleged two distinct injuries caused

28

1   by NOTA: injury to himself as a physician and injury to his patients (which he

2   raises on their behalf). Instead of addressing these injuries directly, Defendant

3   simply lumps Dr. Wagner in with the other Plaintiffs and compounds the error

4   by misconstruing the injuries Plaintiffs have alleged.

5   **1.   Dr. Wagner has standing as a physician.**

6   Courts apply a very liberal standing doctrine to physicians challenging

7   laws that criminalize their preferred course of treatment. *See Doe v. Bolton*,

8   410 U.S. 179, 188-89 (1973) (holding that physicians had independent

9   standing to challenge abortion restriction); *Compassion in Dying v.*

10   *Washington*, 79 F.3d 790, 794-95 (9th Cir. 1996) (en banc), *rev'd on other*

11   *grounds, Washington v. Glucksberg*, 521 U.S. 702 (1997) (same for euthanasia

12   restriction). Dr. Wagner wants to provide a course of treatment that is a federal

13   crime: using marrow cells from donors compensated through

14   MoreMarrowDonors.org in transplants performed on his own patients. He

15   refrains from providing this treatment solely because it is banned by federal

16   law. *See* Compl. ¶¶ 196-201. This injury is directly caused by NOTA's ban on

17   compensating marrow-cell donors and would be redressed by a judgment from

18   this Court declaring that ban unconstitutional. Thus, Dr. Wagner has standing.

19   Furthermore, Dr. Wagner would have standing even if Defendant

20   refused to enforce NOTA against him, because a physician's injury is far

21   broader than the threat of criminal prosecution.  In *Planned Parenthood of*

22   *Idaho v. Wasden*, for example, the Ninth Circuit held that a parental-consent

23   requirement to perform an abortion imposed a "financial and professional"

24   injury on a medical doctor that was "neither speculative nor inchoate." 376

25   F.3d 908, 917 (9th Cir. 2004). Even if he were never prosecuted for violating

26   NOTA, Dr. Wagner would face serious repercussions for committing a federal

27   felony in the course of his medical practice. Compl. ¶¶ 197-200. The Ninth

28

- 4 -

1   Circuit recognizes that medical doctors face consequences beyond criminal

2   prosecution, and grants them pre-enforcement standing accordingly.

3        Physicians also have standing to assert the rights of their patients when

4   there is no practical possibility that their patients can assert their own rights.

5   *See Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (plurality) (holding that

6   doctors had third-party standing to represent pregnant women because of the

7   "imminent mootness" of pregnant women's condition); *Wasden*, 376 F.3d at

8   917 ("Since at least *Singleton v. Wulff*, however, it has been held repeatedly

9   that physicians may acquire *jus tertii* standing to assert their patients' due

10  process rights . . . ."). Dr. Wagner has also asserted the rights of his patients—

11  many of whom have advanced illnesses—to receive marrow transplants from

12  compensated donors. Compl. ¶¶ 209-10. Because many of these patients are

13  critically ill or dying, they cannot be expected to vindicate their own rights in

14  court, and Dr. Wagner is therefore permitted to bring claims on their behalf.

15       The single best discussion of the law in this Circuit governing claims

16  like those brought by Dr. Wagner comes from *Compassion in Dying*, a case

17  that Defendant wholly ignores in his discussion of standing. There, a group of

18  doctors (on behalf of themselves and their patients) challenged a prohibition

19  on euthanasia. 79 F.3d at 795. While the doctors had neither been prosecuted

20  nor threatened with prosecution, the Ninth Circuit found they had standing to

21  "raise the patients' liberty interests" to challenge a law "which proscribe[d] the

22  very conduct in which they [sought] to engage." *Id.* at 795 n.3, 796. The court

23  pointed to a lengthy list of Supreme Court precedent holding that doctors and

24  patients have the right to challenge the constitutionality of criminal

25  prohibitions on medical treatments even in the absence of prosecution or

26  threatened prosecutions. *Id.* at 795-96. Where a criminal law prohibits taking

27  certain actions in the course of providing medical care, doctors and patients

28

1  suffer a sufficiently concrete injury so long as "[t]he state has never indicated

2  that it would not prosecute doctors who violate that law." *Id.* at 796.  Needless

3  to say, there is no such indication here.

### 2.    Defendant misunderstands Plaintiffs' injuries.

5  Even if he did not have special standing as a physician, Dr. Wagner

6  would still have the same basic standing as the other Plaintiffs: They want to,

7  but cannot, participate in a pilot program to compensate marrow donors

8  because NOTA prohibits this conduct. Because an injunction would redress

9  this injury, Plaintiffs have alleged all three prongs of the familiar test for

10  standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

11  Defendant's brief, however, fails to address the injuries actually pled by

12  Plaintiffs in their Complaint, rendering his entire argument irrelevant. In a

13  nutshell, Defendant argues that a favorable decision would not redress

14  Plaintiffs' injury because their harm is supposedly their inability to obtain a

15  marrow transplant, which would depend on the actions of third parties—

16  "millions of individuals [who decide] not to donate" marrow. MTD at 7.

17  But a lack of marrow cells is not Plaintiffs' injury at all; indeed, most of

18  the Plaintiffs do not themselves need marrow-cell transplants. As the

19  Complaint makes clear, their injury is that merely offering compensation to

20  marrow donors as part of a nonprofit program is a felony. Compl. ¶¶ 161-66.

21  To be sure, they hope that offering compensation will <u>result</u> in more marrow

22  donations, but their injury is independent of that result.

23  The best way to understand Defendant's error is by contrasting two

24  Supreme Court decisions from 1976: *Simon v. Eastern Kentucky Welfare*

25  *Rights Organization*, 426 U.S. 26 (1976), and *Craig v. Boren*, 429 U.S. 190

26  (1976). In *Simon*, on which Defendant relies heavily (MTD at 7), indigent

27  individuals who had been denied care by hospitals sued the federal

28

government, arguing that the government was legally required to withhold certain tax benefit from these hospitals. 426 U.S. at 33. The patients' theory of the case was that, by continuing to extend these benefits, the federal government provided an illegal incentive for the hospitals to continue rejecting indigent patients. The Supreme Court rejected this theory of causation, correctly noting that there was no way of knowing how an individual hospital would respond to a change in tax treatment, and that it was entirely possible these hospitals would forgo tax benefits to avoid the cost of treating indigents. *Id.* at 42-43.

But Plaintiffs' allegations of injury are not analogous to *Simon* and are instead closer to *Boren*. The plaintiffs in *Boren* were an alcohol vendor bringing a pre-enforcement challenge to a gender-discriminatory age restriction on alcohol sales that would reduce her revenue and a consumer plaintiff who wished to purchase alcohol.  429 U.S. at 191-92.  Because the consumer-plaintiff was no longer underage, however, his claims were entirely moot.  *Id.* at 193. Under Defendant Holder's theory, the remaining *Boren* plaintiff would not have standing because her revenue depends on the willingness of unidentified third parties to buy alcohol.

The Supreme Court, however, found she had alleged a redressable injury. *Id.* at 194. In other words, because the law forbade her from offering alcohol to minors, the *Boren* plaintiff's injury was complete without having to point to a specific minor who would then purchase the alcohol. Similarly, Plaintiffs want to offer a specific prohibited thing (financial incentives) to a specific universe of people (potential marrow donors). Thus, Plaintiffs have standing to challenge the federal law prohibiting them from making this offer. *See Abigail Alliance for Better Access to Dev. Drugs v. McClellan*, No. 03-1601, 2004 U.S. Dist. LEXIS 29594, at *22 (D.D.C. August 30, 2004)

1  (finding patients had standing to challenge ban on sale of certain

2  pharmaceuticals, even though those pharmaceuticals would have to be

3  purchased from nonparty manufacturers).[2]

4  **B.     Plaintiff MoreMarrowDonors.org Has Standing.**

5  Just as he fails to address Dr. Wagner's injuries as a physician,

6  Defendant also does not squarely address the injuries pled by Plaintiff

7  MoreMarrowDonors.org.[3] MoreMarrowDonors.org has alleged two distinct

8  injuries caused by NOTA. First, as with the other Plaintiffs, a reasonable fear

9  of prosecution under NOTA prevents MoreMarrowDonors.org from acting on

10  its concrete plan to violate NOTA's ban on compensating marrow-cell donors.

11  Second, unlike the other Plaintiffs, MoreMarrowDonors.org is suffering an

12  economic injury because it cannot use, and will have to forfeit, a substantial

13  grant unless it obtains relief from this Court. Compl. ¶¶ 146-54.

14  **1.     MoreMarrowDonors.org has a concrete plan to violate NOTA and a reasonable fear of prosecution for**

15  **violating NOTA.**

16  MoreMarrowDonors.org has alleged a concrete plan to violate NOTA,

17  and has alleged that the only thing preventing it from carrying out this plan is

18  its reasonable anticipation of Defendant's enforcement of NOTA. Hence, like

19  the other Plaintiffs, it has standing.

20  Defendant argues that MoreMarrowDonors.org lacks standing under the

21  three-part test originating in two Ninth Circuit opinions: *Thomas v. Anchorage*

22  *Equal Rights Commission*, 220 F.3d 1134 (9th Cir. 2000) (en banc) and *San*

23  *Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996).

24

25  [2] Though the D.C. Circuit eventually reviewed the case *en banc*, this standing holding was never disturbed. *See Abigail Alliance for Better Access to Dev. Drugs v. von Eschenbach*,

26  495 F.3d 695 (D.C. Cir. 2007) (en banc).

27  [3] Individual plaintiffs Akiim DeShay and Mike Hamel, as board members of MoreMarrowDonors.org, are unable to carry out their duties to the organization and in

28  that capacity are injured to the same extent the organization itself is.

1  In *San Diego County Gun Rights*, the panel identified three factors whose
2  combined absence was fatal to pre-enforcement standing: (1) the plaintiffs'
3  complaint had no "articulated concrete plans" to violate the law; (2) plaintiffs
4  had not alleged a specific threat to prosecute them; and (3) there was no
5  history of prosecutions under the law being challenged, which made it
6  unreasonable to believe there was a genuine threat of prosecution. 98 F.3d at
7  1126-28. This general framework was adopted in *Thomas*, 220 F.3d at 1139,
8  but that case "did not purport to overrule years of Ninth Circuit and Supreme
9  Court precedent recognizing the validity of pre-enforcement challenges to
10 statutes infringing upon constitutional rights." *California Pro-Life Council,*
11 *Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003).

12     Defendant concedes MoreMarrowDonors.org has met the first prong of
13 *Thomas*, but argues that it nonetheless lacks standing because it has not
14 alleged a specific threat of prosecution or because it would be unreasonable to
15 expect prosecution.  But Defendant is misapplying that case.

16     A specific threat of enforcement against a plaintiff is obviously
17 *sufficient* to support standing—the threatened individual could bring a
18 challenge—but this Circuit has never held that a specific threat is *necessary*
19 for standing. In fact, Defendant appears to be asking this Court to adopt a rule
20 of standing similar to that of the D.C. Circuit, which does require "actual
21 threats of arrest made against a specific plaintiff" in order to find pre-
22 enforcement standing to challenge a criminal law. *Seegars v. Gonzales*, 396
23 F.3d 1248, 1252 (D.C. Cir. 2005) (citing, inter alia, *San Diego County Gun*
24 *Rights Comm*, 98 F.3d at 1127). This Court should decline the invitation to
25 follow the D.C. Circuit in imposing this requirement—if for no other reason
26 that that the D.C. Circuit itself has recognized that its decision in *Seegars*
27 cannot be reconciled with Supreme Court precedent. *See Parker v. District of*
28

- 9 -

1   *Columbia*, 478 F.3d 370, 375 (D.C. Cir. 2007) ("[T]he Supreme Court [has

2   prescribed] a far more relaxed stance on pre-enforcement challenges than

3   [*Seegars*] permit[s]. Nevertheless, unless and until this court en banc overrules

4   these recent precedents, we must be faithful to *Seegars* . . . .").

5        Moreover, Plaintiffs have specifically alleged that Defendant enforces

6   the criminal provisions of NOTA. Compl. ¶ 166. Nothing further is required at

7   the pleadings stage. *See* Fed. R. Civ. P. 8(a) (requiring a short and plain

8   statement of the claim).[4] Plaintiffs have alleged that they seek to engage in a

9   high-profile campaign in violation of a federal criminal law that Defendant

10  enforces. It is reasonable to anticipate prosecution under the law, and Plaintiffs

11  therefore have standing. It is certainly possible that Defendant could take steps

12  to obviate that standing, if he were to "disavow[] any intention of invoking [a]

13  criminal penalty." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289,

14  302 (1979). But he has conspicuously refrained from doing so, and his Motion

15  to Dismiss for lack of standing must therefore be denied.

16       **2. MoreMarrowDonors.org suffers an economic injury.**

17       MoreMarrowDonors.org has a second, independent basis for standing:

18  economic injury.[5]  MoreMarrowDonors.org has received a restricted grant of

19  funds that may be used solely to compensate marrow-cell donors. If

20

21  [4] While this Court need not resolve the question of whether NOTA is ever enforced to deny
22  Defendant's Motion and while it cannot consider evidence on that point in resolving a
    Motion to Dismiss, it is worth noting that Defendant's assertion that he is not "aware of
23  any actual prosecutions under § 274e during the twenty five years that the statute has
    been on the books" is easily refuted by a simple LEXIS search. *See generally United*
24  *States v. Cheng Yong Wang*, 1999 U.S. Dist. LEXIS 2913 (S.D.N.Y. March 15, 1999)
    (granting motion to dismiss indictment under 42 U.S.C. § 274e); *see also* David Porter &
25  Carla K. Johnson, *Brooklyn Man Accused of Buying and Selling Kidneys*, Associated
    Press, July 25, 2009 (detailing arrest of New York man by federal agents for violation of
26  NOTA).

27  [5] Importantly, this Court "need not rely on the three-factor test applied in *Thomas*" when
    evaluating the "tangible economic injury" alleged by MoreMarrowDonors.org. Nat'l
28  *Audobon Soc'y, Inc. v. Davis*, 307 F.3d 835, 855 (9th Cir. 2002).

- 10 -

1  MoreMarrowDonors.org does not use this money to compensate marrow-cell

2  donors, it must forfeit the money. Under California law,

3  MoreMarrowDonors.org has a legally enforceable obligation to honor its

4  benefactor's wishes. *See, e.g., L.B. Research & Educ. Found. v. UCLA*

5  *Found.*, 29 Cal. Rptr. 3d 710, 713-14 (Cal. Ct. App. 2005). Thus,

6  MoreMarrowDonors.org faces two options: either it obtains no judicial relief

7  and forfeits a substantial amount of money, or it obtains an order from this

8  Court allowing it to pursue its proposed donor-compensation plan.

9       Defendant's (inaccurate) assertion that he does not enforce NOTA is

10 irrelevant to this basis for standing because it arises out of an *economic* injury,

11 not a threat of prosecution. In *National Audobon Society, Inc. v. Davis*, the

12 Ninth Circuit found that trappers had standing to challenge an anti-trapping

13 law because the statute injured them economically, not because prosecution

14 was imminent. 307 F.3d 835, 855 (9th Cir. 2002) (true injury was "not a

15 hypothetical risk of prosecution but rather actual, ongoing economic harm . . .

16 . ."). Similarly, MoreMarrowDonors.org faces an actual economic harm from

17 complying with the law it challenges here.

18      Defendant does not dispute the existence of this economic injury.

19 Instead, Defendant argues that the injury is not caused by NOTA because

20 "several" states appear to prohibit compensating marrow donors, meaning that

21 relief in this Court would not redress their injury by enabling

22 MoreMarrowDonors.org to launch a nationwide pilot program. MTD at 11-12.

23 But even if Plaintiffs concede—which they do not—that the state laws cited

24 by Defendant would prohibit MoreMarrowDonors.org from operating in those

25

26

27

28

- 11 -

1  states,[6] that does not mean that MoreMarrowDonors.org is not injured by a

2  federal law that bars them from operating in *any* state. If

3  MoreMarrowDonors.org were forced to include a disclaimer on its website

4  ("offer void where prohibited") that might mean it could not, technically, run a

5  "nationwide" program, but that fact is irrelevant to the injury the organization

6  complains of here: federal law prohibits it from spending its restricted funds *at*

7  *all*, even though it would be legal to do so in nearly every state.

8  **C.     The Other Individual Plaintiffs Have Standing.**

9       The remaining Plaintiffs—who wish to participate in

10  MoreMarrowDonors.org's plan to offer compensation to marrow-cell

11  donors—have standing to proceed in this action for the reasons described in

12  Section B.1, *supra*. Because Defendant has not shown that each Plaintiff lacks

13  standing, his Motion to Dismiss for lack of jurisdiction must be denied.

14  **II.    APPLYING  NOTA TO PLAINTIFFS VIOLATES THE EQUAL**
    **PROTECTION GUARANTEE OF THE FIFTH AMENDMENT.**
15

16       Plaintiffs' Complaint presents a constitutional question of first

17  impression: Does the equal protection guarantee of the Fifth Amendment

18  allow Defendant Holder to apply NOTA to Plaintiffs' nonprofit pilot program?

19  The salient facts are simple: Marrow cells are renewable blood cells, and

20  Congress deliberately excluded blood cells from NOTA because Congress

21  deliberately rejected the proposition that compensation for renewable cells

22  such as blood is equivalent to compensation for nonrenewable solid organs

23  such as kidneys. Because excluding blood cells from NOTA while including

24  marrow cells is patently arbitrary, this statutory classification lacks a rational

25  basis and therefore, under an unbroken line of Supreme Court authority, is

26  _____

27  [6] Marrow cells are not "organs," *see supra* at 2-3, so compensated marrow-cell
     donation would not be illegal under those state statutes, such as in Connecticut, Florida, and

28  Tennessee, that do not define marrow as an organ.

1   unconstitutional. *E.g.*, *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S.

2   432, 446 (1985) (the government "may not rely on a classification whose

3   relationship to an asserted goal is so attenuated as to render the distinction

4   arbitrary or irrational."). The motion to dismiss must be denied.

5       **A.   This Court Should Apply the Rational-Basis Test As It Is**
        **Actually Applied by the Supreme Court.**

6

7        The most important decision the Court will make in applying the Fifth

8   Amendment to this novel case[7] is deciding which version of the rational-basis

9   test to follow: a meaningless one or the one the Supreme Court actually

10  applies. Defendant Holder's brief urges a meaningless version on the Court.

11  Relying on isolated *dicta*, he constructs an account of judicial review so

12  grossly slanted that no result is conceivable other than judgment for the

13  government.  MTD at 14-15. To put it bluntly, Defendant seems to believe that

14  "rational-basis test" is code for "the government always wins."

15       But the government does not always win. Although rational-basis

16  review is deferential and not a forum for the expression of mere disagreement

17  with legislative choices, *Heller v. Doe*, 509 U.S. 312, 319 (1993), the case law

18  demonstrates that it is not meaningless. Of the 126 rational-basis cases before

19  the Supreme Court since 1970, plaintiffs prevailed in 21 or about 17 percent.

20  *See* App. A. In deciding these 21 plaintiff-wins cases, the Supreme Court

21  rejected 51 asserted rational bases. *See* App. B. Running to hundreds of pages,

22  these 21 cases not only refute the notion that "the government always wins,"

23  but also set forth four principles of adjudication that enable courts—including

24

25

26

27  [7] NOTA has never been the subject of a constitutional challenge. There are no precedents

28    directly on point.

1 those in the Ninth Circuit, *see* Appendix C for recent cases—to identify those

2 instances where government has acted in an unconstitutionally irrational way.[8]

3     **B.   Federal Courts Reject Four Classes of "Rational" Bases.**

4       Plaintiffs prevail in Supreme Court rational-basis cases when the Court

5 agrees that the plaintiff has negated every plausible basis for a law. Although

6 the government has no affirmative evidentiary burden and may defend a

7 challenged law with "rational speculation," *FCC v. Beach Communications,*

8 *Inc.*, 508 U.S. 307, 314-15 (1993), a plaintiff is entitled to adduce evidence,

9 case law, and reasoning to establish the irrationality of asserted rational bases,

10 *see e.g.*, *Heller*, 509 U.S. at 320-21; *Lazy Y Ranch, Ltd. v. Behrens*, 546 F.3d

11 580, 590-91 (9th Cir. 2008) ("our circuit has allowed plaintiffs to rebut the

12 facts underlying defendants' asserted rationale for a classification . . . .").

13       The Supreme Court does not rule for plaintiffs randomly. What

14 distinguishes the 21 plaintiff-wins cases from the 106 plaintiff-loses cases are

15 four objective criteria. By understanding this framework, the Court can engage

16 in principled rational basis review that is deferential while still enforcing the

17 right to be free of irrational statutory classifications.

18       *1.    Conflict with Known Legislative Intent:* The Supreme Court

19 rejects hypothetical rationales for a law "when an examination of the

20 legislative scheme and its history demonstrates that the asserted purpose could

21 not have been a goal of the legislation." *Weinberger v. Wiesenfeld*, 420 U.S.

22 636, 648 n.16 (1975) (citing, among others, the rational-basis case *U.S. Dep't*

23 *of Agric. v. Moreno*, 413 U.S. 528, 536-37 (1973)). In *Weinberger*, the

24 government tried to justify a law that awarded only widows, but never

---

25

26 [8] In his reply, Defendant Holder may argue that the plaintiff-wins cases are "fake" cases
where the Supreme Court really applied heightened scrutiny. The Court should be wary of
any claim that boils down to "the government always wins." As Chief Justice Roberts

27 recently observed: "There is a difference between judicial restraint and judicial abdication."
*Citizens United v. FEC*, No. 08-205, 2010 U.S. LEXIS 766, at *109 (Jan. 21, 2010).

28

1   widowers, a Social Security death benefit on the asserted rationale that the law

2   sought to compensate women as a class for their economic disadvantages. 420

3   U.S. at 648. The Supreme Court rejected this hypothetical rationale because

4   the legislative history and overall structure of the statute conclusively

5   demonstrated that the actual purpose of the law was to enable a surviving

6   spouse to stay home and care for the children. *Id.* at 649-52. The Supreme

7   Court invalidated the law on the grounds that the actual purpose was an

8   "entirely irrational" form of discrimination. *Id.* at 651; *id.* at 655 (Rehnquist,

9   J., concurring) (agreeing with the majority ruling "in Part III-B of its opinion,

10  that [the statute] does not rationally serve any valid legislative purpose,

11  including that for which [it] was obviously designed."). Thus, although

12  legislatures are not required to justify their choices, *e.g. Nordlinger v. Hahn*,

13  505 U.S. 1, 15 (1992), and the absence of legislative history permits

14  consideration of hypothetical rationales for a challenged law, *e.g. Heller*, 509

15  U.S. at 320, *Weinberger* holds that the actual purpose of a law—when it can

16  be identified in the history and structure of the legislative scheme—controls

17  equal-protection analysis in the rational basis context and otherwise. [9]

18      2.      *No Legitimate Government Interest:* The Supreme Court also

19  rejects asserted rational bases that are motivated by illegitimate interests like

20  animus or sheer disapproval for its own sake. The constitutional

21  impermissibility of naked disapproval is well illustrated in *Cleburne*. There, a

22  Texas town refused to grant a permit to a group home for the mentally

---

[9] *See also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) ("avoiding concentration of population" and "lessening congestion" rejected as hypothetical rationales because the city council in reality had no objection to development); *Williams v. Vermont*, 472 U.S. 14, 26 (1985) (raising sales-tax revenue from out-of-staters rejected as hypothetical rationale because in reality the General Assembly deliberately exempted out-of-staters from sales tax); *Moreno*, 413 U.S. at 536-37 (eliminating food stamp fraud rejected as hypothetical rationale because in reality Congress intended that problem to be addressed elsewhere in another way); *Servin-Espinoza v. Ashcroft*, 309 F.3d 1193, 1197-99 (9th Cir. 2002) (cannot assess hypothetical rationales that Congress has "forbidden").

1    handicapped in part because neighborhood residents simply did not want them
2    around. In rejecting this anti-mental-retardation bias, the Supreme Court held
3    that government never has a legitimate interest in advancing private enmity or
4    moral distaste when they lack an independent justification in public health and
5    safety. *Cleburne*, 473 U.S at 448. Thus, to the extent that the government
6    interest underlying an asserted rational basis is tantamount to naked dislike,
7    that interest is illegitimate.[10]

8        3.    *No Logical Connection:* The Supreme Court also rejects asserted
9    rational bases when there is a complete logical disconnect between means and
10   ends. *See Zobel v. Williams*, 457 U.S. 55, 61-62 (1982); *Merrifield v. Lockyer*,
11   547 F.3d 978, 991 (9th Cir. 2008) ("while a government need not provide a
12   perfectly logical[] solution to regulatory problems, it cannot hope to survive
13   *rational* basis review by resorting to irrationality."). *Zobel* was a challenge to
14   an Alaskan program that distributed oil revenue each year to citizens based on
15   their length of residency: the longer you had lived in Alaska by 1980, the
16   bigger your share of the oil money indefinitely. 457 U.S. at 56-57.  Alaska
17   tried to justify its unequal treatment of pre- and post-1980 residents by arguing
18   that the windfall to pre-1980 residents: (1) encouraged others to move to
19   Alaska; and (2) gave residents a stake in the prudent management of oil
20   reserves. *Id.* at 61. Although granting that these justifications were rational in

21

22   [10] *See also Lawrence v. Texas*, 539 U.S. 558, 578 (2003) (no legitimate interest in
     criminalizing consensual adult homosexual acts); *Romer v. Evans*, 517 U.S. 620, 634
23   (1996) (no legitimate interest in anti-gay animus); *Hooper v. Bernalillo County Assessor*,
     472 U.S. 612, 623 (1985) (no legitimate interest in dividing bona fide state residents into
24   different classes); *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 880 (1985) (no legitimate
     interest in discriminating against out-of-state companies); *Zobel v. Williams*, 457 U.S. 55,
25   65 (1982) (no legitimate interest in creating permanent classes of bona fide residents);.
     *Moreno*, 413 U.S. at 534 (no legitimate interest in anti-hippie animus); *Id.* at 536 n. 7
26   ("traditional morality" rationale constitutionally dubious); *In re Levenson*, 587 F.3d 925,
     932 (9th Cir. 2009) (same as *Romer*); *Merrifield v. Lockyer*, 547 F.3d 978, 992 n.15 (9th
27   Cir. 2008) (economic protectionism not a legitimate government interest); *Lazy Y Ranch,
     Ltd.*, 546 F.3d at 590 (bias against conservationists not a legitimate government interest).
28

- 16 -

1   the abstract, the Supreme Court nevertheless rejected them in context because

2   there was no logical connection between the backward-looking bonus for pre-

3   1980 Alaska residents and the forward-looking goals of attracting new

4   residents and managing natural resources. *Id.* at 60-64.  Thus, to the extent that

5   there is a complete logical disconnect between an asserted rational basis and

6   the law, that rational basis must be rejected.[11]

7        *4.     Irrational Effects:* Finally, the Supreme Court also rejects

8   asserted rational bases that—although perhaps not technically illogical—are so

9   devoid of reason and proportionality as to be arbitrary. A good example is

10  *Allegheny Pittsburgh Coal Co. v. County Commission*, 488 U.S. 336 (1989).

11  In *Allegheny*, the state of West Virginia used the most recent purchase price of

12  land to assess property taxes. Because the recent sale price was the sole

13  determinant of the assessed property value, people who purchased property

14

15  [11] *See also U.S. v. Morrison*, 529 U.S. 598, 612-13 (2000) (no rational basis for nexus with
    interstate commerce because asserted bases logically incompatible with limits on
16  Commerce power); *U.S. v. Lopez*, 514 U.S. 549, 564 (1995) (same); *Quinn v. Millsap*,
    491 U.S. 95, 108 (1989) (ability to grasp politics not logically connected to land
17  ownership); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 449 (1985) (home
    being too big not logical basis for permit denial when identical homes routinely granted
18  permits); *Williams v. Vermont*, 472 U.S. 14, 24-25 (1985) (encouraging Vermont
    residents to make in-state car purchases not logical basis for tax on car that Vermont
19  resident purchased out-of-state before becoming Vermont resident); *Chappelle v. Greater
    Baton Rouge Airport Dist.*, 431 U.S. 159 (1977) (ability to grasp politics not logically
20  connected to land ownership); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)
    (stimulating the agricultural economy not logically connected to whether people in a
21  household are related or unrelated); *Mayer v. Chicago*, 404 U.S. 189, 196 (1971) (if
    inability to pay is no basis to deny transcript to felony defendant, then inability to pay no
22  logical basis for denying transcript to misdemeanant); *Turner v. Fouche*, 396 U.S. 346,
    363-64 (1970) (no rational interest underlying property-ownership requirement for
23  political office); *In re Levenson*, 587 F.3d 925, 932 (9th Cir. 2009) (denying benefits to
    encourage traditional heterosexual marriage is logically irrelevant to homosexuals who
24  are in same-sex marriages); *Ramirez-Altimirano v. Holder*, 563 F.3d 800, 808 (9th Cir.
    2009) (if possession of drugs does not disqualify a person for criminal record
25  expungement, then possession of drug paraphernalia cannot logically be a rational basis
    for denying expungement); *Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008);
26  *Silveira v. Lockyer*, 312 F.3d 1052, 1090-91 (9th Cir. 2002); *Dillingham v. INS*, 267 F.3d
    996, 1009-11 (9th Cir. 2002); *Lujan-Armendariz v. INS*, 222 F.3d 728, 749 (9th Cir.
27  2000); *Petzak v. Nev. Dep't of Corr.*, 579 F. Supp. 2d 1130, 1137 (D. Nev. 2008);
    *Cornwell v. Hamilton*, 80 F. Supp. 2d 1101, 1108 (S.D. Cal. 1999).

28

1  recently were taxed as much as 35 times more than neighbors who purchased

2  long ago. *Id.* at 340-341. The county argued that its method of assessing taxes

3  was generally rational—although unfair in some instances—because purchase

4  price can be the most precise measure of property value. *Id.* at 343. The

5  Supreme Court rejected this rationale because the taxation scheme generated

6  disparities so gross as to be arbitrary. *Id.* at 345-46. Thus, a law will not

7  survive rational-basis review if its effects are irrationally disproportionate to

8  any plausible benefit.[12]

9  **C.  Defendant Holder Asserts No True Rational Basis.**

10  Defendant Holder asserts no less than nine purported rational bases for

11  banning organ sales, most of which are merely listed without any

12  accompanying explanation. Plaintiffs need not respond to each of these,

13  because they are not asking the Court to strike down NOTA on its face[13]—

14  instead they are merely challenging the application of NOTA to their program

15  of providing incentives to marrow-cell donors. Marrow cells are just blood

16  cells and Congress has determined it should be legal to compensate people for

17  blood (that is, Congress has rejected the rationales that would lead to

18  

19  ───────────────

[12] *See also Plyler v. Doe*, 457 U.S. 202, 230 (1982) (saving state money by denying illegal
immigrant children an education is a "wholly insubstantial [benefit] in light of the costs
involved to these children, the State, and the Nation" of creating an illiterate subclass);
*James v. Strange*, 407 U.S. 128, 141-42 (1972) (saving state funds by denying indigent
defendants exceptions to the enforcement of debt judgments grossly disproportionate to
the harms it inflicts on debtors); *Lindsey v. Normet*, 405 U.S. 56, 77-78 (1972) (deterring
a few frivolous appeals insufficient to justify a surety requirement that allows many
frivolous appeals, denies many meritorious appeals, and showers a windfall on landlords);
*Reed v. Reed*, 404 U.S. 71, 76-77 (1971) (reducing the workload of the probate courts by
excluding women from service as administrators in certain cases is completely arbitrary);
*In re Levenson*, 587 F.3d 925, 932-33 (9th Cir. 2009) (trivial financial savings to
government irrationally disproportionate to harm caused by discriminatory definition of
marriage); *Cornwell v. Hamilton*, 80 F. Supp. 2d 1101, 1108 (S.D. Cal. 1999) ("minimal
overlap" between plaintiff's activities and cosmetology license made application of the
licensing requirement to plaintiff irrational).

[13] Indeed, the Complaint explicitly outlines the rational bases underlying NOTA's ban on
markets in solid organs—none of which applies to bone marrow. Compl. ¶¶ 170-77.

- 18 -

prohibiting compensation for blood). Plaintiffs simply seek a judgment preventing the enforcement of NOTA only against their nonprofit, nonmarket, noncash pilot program for marrow-cell donation. Nevertheless, Plaintiffs will use the framework outlined above to briefly respond to each "rational" basis—and, indeed, a brief response to each is all that is necessary to demonstrate that Defendant's motion to dismiss must be denied, a fact record must be developed, and Plaintiffs' constitutional claims must be heard on their full merits.

### i.  Selling body parts is morally wrong (MTD at 17)

*Conflicts with Known Legislative Intent:* Congress deliberately concluded that compensation for renewable tissues such as blood cells is morally acceptable. Compl. ¶¶ 178-82.

*No Legitimate Government Interest:* Free-floating moral disapproval unanchored to any independent health and safety justification is not a legitimate government interest.

### ii.  The poor will be exploited (MTD at 17)

*Conflicts with Known Legislative Intent:* Congress deliberately concluded that compensation for renewable tissues like blood is not exploitation. Compl. ¶¶ 178-82.

*No Logical Connection:* The actual purpose of NOTA was to forbid a person from trading an irreplaceable, life-sustaining organ for short-term financial gain. Compl. ¶¶ 170-77. That concern has no logical application in the marrow-cell context: marrow cells are blood cells, not organs and, like other cells for which people may be compensated, they are renewable.

### iii. The rich will be at an advantage (MTD at 17)

*No Logical Connection I:* Plaintiffs want only to establish a nonmarket, noncash pilot program. A third-party charity will provide the compensation,

1   which is nonnegotiable. Donors and patients will remain anonymous. There is
2   no conceivable way for a patient's wealth to matter. Compl. ¶ 149-53.

3       *No Logical Connection II:* Wealth is an advantage only when patients
4   are in competition for the same donor. In a kidney market, where every donor
5   is biologically compatible with many patients, the rich would have an
6   advantage over the poor, buying up kidneys that might otherwise have been
7   available to the poor. But it is beyond all biological plausibility that two
8   marrow patients will ever simultaneously need marrow cells from the same
9   donor.[14] Because marrow patients never compete for the same donor, one
10  patient could never secure a donor at the expense of another patient.

11      **iv. Incentives will decrease altruistic donation (MTD at 17)**

12      *Conflicts with Known Legislative Intent:* Congress deliberately
13  concluded that compensation for renewable tissues such as blood is acceptable
14  regardless of the effect on altruistic donation.

15      *No Logical Connection:* If Congress were concerned that financial
16  incentives would "crowd out" altruistic donors of renewable cells, it would
17  have outlawed financial incentives for renewable cells—not just for an
18  arbitrary subset of renewable cells.  While the government is allowed to adopt
19  incremental solutions to problems, *see City of New Orleans v. Dukes*, 427 U.S.
20  297 (1976), they must be incremental solutions actually directed at solving the
21  problem, not permanent arbitrary distinctions like the one drawn in NOTA.

22      **v.  Donors with incentives will lie about their health (MTD at 17)**

23      *Conflicts with Known Legislative Intent:* Congress deliberately
24  concluded that compensation for renewable tissues such as blood is
25  permissible, despite potential lying.

26  _____

27  [14] As described in the Complaint, marrow-cell matches (unlike kidney matches) are
     vanishingly rare, making the possibility of a simultaneous match practically impossible.
28   Compl. ¶¶ 109-21.

*No Logical Connection:* While safe for the donor, a marrow-cell transplant is extremely dangerous for the patient and undertaken only when death is imminent. Thus, with every marrow-cell transplant, the patient must consent to a procedure that can be (and often is) fatal. Compl. ¶¶ 106-08. No rational person could believe both that patients are <u>always</u> able to consent to the (tremendous) risks of marrow-cell transplantation, but <u>never</u> to the (marginal) risks of a marrow-cell transplantation from a compensated donor.

*Irrational Effects:* Patients in need of marrow cells will die unless they find the one needle-in-a-haystack donor who is a genetic match. By "protecting" patients from the risk of receiving marrow cells from a compensated donor, NOTA irrationally causes an incomparably worse outcome for them: Death.  No rational legislator could conclude that certain death is better than the possibility of survival with the risk of an infection.

### vi.   Donors will charge high prices to patients (MTD at 17)

*No Logical Connection:* As described in subsection iii above and in the Complaint, it is impossible for Plaintiffs' proposed program to lead to a market (or monopoly pricing or even negotiation), so there is no connection between applying NOTA to Plaintiffs and preventing monopoly prices.

*Irrational Effects:* This proffered basis faces the same problem as the fear of donors' lying about their health. Defendant Holder is essentially arguing that the government must "protect" private citizens from paying a high price to save their lives by forbidding a charity like MoreMarrowDonors.org from offering a $3,000 scholarship to marrow-cell donors.  No rational legislator could believe that a patient's death is better than to the (nonexistent) financial "harm" to a patient of having a charity provide a modest scholarship to a third party who will save the patient's life.

- 21 -

1

**vii.  Incentives increase the "transplantation budget" (MTD at 17)**

2   *No Logical Connection:* Plaintiffs wish to use third-party philanthropic

3   money to offer incentives to some marrow-cell donors. Criminalizing private

4   philanthropic activity has no logical effect on any budget, either the federal

5   one or a patient's private healthcare costs (which would be wholly separate

6   from MoreMarrowDonors.org's activities).

7   *Irrational Effects:* No rational legislator could ever conclude that the

8   way to reduce the cost of a transplant is by arbitrarily criminalizing something

9   that makes transplants happen. Imagine, for example, a prohibition on

10   transplanting marrow cells in airplanes to "save" money for patients. While

11   banning air travel for marrow cells would certainly save patients money, it

12   would also have the irrationally disproportionate effect of killing them.

13   **viii.  There are risks to marrow-cell donation (MTD at 19-20)**

14   *No Logical Connection:* Defendant Holder argues that it is rational to

15   ban compensation for marrow-cell transplants because Congress wants to

16   prevent marrow-cell donors from exposing themselves to the risks of donation.

17   But this is not true. Congress has funded the marrow registry for 25 years. 42

18   U.S.C. §§ 274k-m; Compl. ¶¶ 132-35. Over 4,500 people donated marrow

19   cells to strangers just last year, and everyone, including everyone in Congress,

20   would cheer if that number increased. No one in Congress or the medical

21   profession doubts that adults are able to accept the risks of donation.

22   The salient question, therefore, is not what are the risks of marrow-cell

23   donation, but how a rational legislator could ever conclude that adults are

24   <u>always</u> capable of accepting the risks of uncompensated marrow-cell donation

25   (and always capable of accepting the risks of compensated blood donation) but

26   <u>never</u> capable of accepting the risks of compensated marrow-cell donation?

27   There is no rational answer to this question because it is impossible to believe

28

1   that adults lose all ability to accept the risks of donating marrow cells, but no

2   other kinds of renewable cells, when compensation is available.[15]

3        **ix.   Congress could have banned incentives for blood (MTD at 21)**

4        Finally, Defendant Holder argues that because Congress could have

5   banned compensation for blood, its arbitrary decision to ban compensation for

6   marrow-cell donation is immune from review. But this ignores the very

7   purpose of a prohibition on arbitrary classifications. As the cases above show,

8   the fact that the government could, e.g., not have a reform commission, or not

9   issue zoning permits, or not exempt any vehicles from taxes, or not distribute

10  oil money, or not issue food stamps, does not mean that the government can

11  arbitrarily deny membership on a reform commission, arbitrarily deny zoning

12  permits, arbitrarily exempt vehicles from taxes, arbitrarily distribute oil

13  money, or arbitrarily distribute food stamps. Thus, as long as the law allows

14  compensation for blood, it cannot draw arbitrary distinctions between blood

15  and marrow cells. Ruling otherwise would obliterate equal protection.

16  **III.   APPLYING NOTA TO PLAINTIFFS VIOLATES DUE PROCESS.**

17

18       Applying NOTA to Plaintiffs would also violate substantive due

19  process. Further, the question of whether Plaintiffs' claims deserve heightened

20  scrutiny cannot be resolved on the pleadings.

21

22

23

24  [15] Furthermore, changing circumstances can deprive a statute of a rational basis. *Compare United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938) (upholding as rational a federal ban on shipping filled milk) *with Milnot Co. v. Richardson*, 350 F. Supp. 221,

25  224-25 (S.D. Ill. 1972) (declaring same federal ban unconstitutional as changed circumstances meant the justifications advanced for the law in *Carolene Products* could

26  "no longer be used rationally"). Even if it were rational to prohibit compensation for marrow-cells collected directly from a donor's hip, the fact that marrow cells can now be

27  collected using the same apheresis technique used for harvesting blood plasma from compensated donors renders that ban unconstitutional. Compl. ¶ 95.

28

### A.    Rational-Basis Review

Because, as the equal protection argument established, there is no rational basis for applying NOTA to Plaintiffs, doing so violates Plaintiffs' substantive due-process rights just as it violates their equal-protection rights. *Hooks v. Clark County Sch. Dist.*, 228 F.3d 1036, 1041 (9th Cir. 2000).

### B.    Fundamental Rights

As Defendant recognizes, the Due Process Clause of the Fifth Amendment includes unenumerated fundamental rights that are objectively rooted in American history and traditions. MTD at 23-24 (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). Because the existence of an unenumerated fundamental right is a complex factual question, Plaintiffs' substantive due-process claims cannot be resolved at the 12(b)(6) stage.

The crux of a fundamental-rights analysis is defining the right in question with a degree of specificity sufficient to allow precise historical inquiry. *Glucksberg*, 521 U.S. at 720-21 (citations omitted). Plaintiffs have met this standard, seeking to vindicate the right to participate in a safe, non-experimental, lifesaving medical procedure. This right cannot be abridged simply because someone is being compensated. Indeed, the historical evidence will show that when Congress enacted NOTA in 1984, it became illegal for the first time in American history to compensate someone for a lifesaving medical good or service that could legally be provided for free.

Defendant argues that Plaintiffs define the relevant right too broadly. He claims that banning compensation for a medical good or service does not constitute banning that good or service. MTD at 24. He proposes instead that the right in question be defined much more narrowly: "The right to offer financial incentives to potential donors to try to increase the chance of finding a matching bone marrow donor." *Id.* This narrow version of the right, he

- 24 -

1   argues, cannot be rooted in history because bone marrow donation is a recent

2   innovation. *Id.* at 25.

3        Defendant Holder defines the right too narrowly, and thus is wrong in

4   his constitutional analysis, for two reasons. First, substantive rights exist in the

5   real world where real people earn compensation, and the government cannot

6   indirectly attack fundamental rights by attacking compensation. *E.g.*, *City of*

7   *Lakewood v. Plain Dealer Publ'g. Co.*, 486 U.S. 750, 756 n.5 (1988) ("Of

8   course, the degree of First Amendment protection is not diminished merely

9   because the newspaper or speech is sold rather than given away.").

10       Second, there is a difference between "carefully formulating" a right,

11  *Glucksberg*, 521 U.S. at 722,  and simply defining it away. Plaintiffs have

12  defined the right at issue carefully, referring specifically to safe, non-

13  experimental, lifesaving, and otherwise legal medical procedures—a careful

14  description that will allow this Court, after receiving appropriate briefing and

15  factual support, to determine whether the right is sufficiently rooted in our

16  history to be deemed "fundamental."[16]  There is no basis for making that

17  determination at this stage, when neither full briefing nor factual support has

18  been presented to the Court.

19                              **CONCLUSION**

20       For the reasons above, Defendant's motion must be denied.

21  **Dated:  February 16, 2010.**

22                                        Respectfully submitted,

23                                        /s/ Jeff Rowes

24                                        William H. Mellor*
                                          Jeff Rowes*
25

---

26  [16] To the extent Defendant claims that altruism has always been the norm, MTD at 25, that
        is simply a factual assertion that is inappropriate at the motion to dismiss stage. It is also
27      wrong. As Plaintiffs will prove, altruism has never been the legal norm for the donation
        of renewable cells.
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Robert McNamara*
Institute for Justice
*Admitted pro hac vice
Justin D. Sobodash
(State Bar # 217450)
The Law Offices of
Justin Sobodash

- 26 -

1

## **CERTIFICATE OF SERVICE**

2

3       I hereby certify that on this 16th day of February, 2010, a true and

4   correct copy of this PLAINTIFF'S MEMORANDUM OF POINTS AND

5   AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO

6   DISMISS was electronically filed using the Court's ECF system and notice of

7   this filing will be sent via e-mail to all parties by operation of the Court's

8   electronic notification system.  Parties may access this filing through the

9   Court's system.

10

11   /s/ Jeff Rowes

12   Jeff Rowes
     Institute for Justice
13   Attorney for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28